Slip Op. 17-37

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **FORMER EMPLOYEES OF GEOKINETICS, INC.,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES SECRETARY OF LABOR,**<br><br>    **Defendant.** | **Before: Claire R. Kelly, Judge**<br><br>**Court No. 16-00057**<br>**PUBLIC VERSION** |

## OPINION AND ORDER

[Remanding the U.S Department of Labor's negative determination on remand denying certification to Plaintiffs as entitled to Trade Adjustment Assistance and Alternative Trade Adjustment Assistance benefits.]

Dated: April 3, 2017

Gregory Carroll Dorris, Pepper Hamilton LLP of Washington, DC, for plaintiff.

Agatha Koprowski, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC for defendant. With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director. Of counsel on the brief was Tecla A. Murphy, Attorney Advisor, Employment and Training Legal Services, Office of the Solicitor, U.S. Department of Labor.

Kelly, Judge:   Before the court for review is the U.S. Department of Labor's

("Department" or "Labor") remand determination denying certification to Plaintiffs as a

class of workers entitled to Trade Adjustment Assistance ("TAA") and Alternative Trade

Adjustment Assistance ("ATAA") benefits under Section 222(c)(2) of the Trade Act of

1974, as amended, 19 U.S.C. § 2272(c)(2) (2012).[1]  <u>See</u> Geokinetics, Inc. Notice of

Negative Determination on Remand, Sept. 16, 2016, ECF No. 14-1 ("Remand Results").

Labor filed its Remand Results pursuant to the court's order, which granted Defendant's

unopposed motion for remand of Labor's Negative Determination Regarding Eligibility

Relating to Geokinetics, Inc. ("Negative Determination").  Order, Aug. 25, 2016, ECF No.

13 ("Remand Order"); Conf. Administrative R. Item p at 93–98, Sept. 16, 2016, ECF No.

15-1 ("Negative Determination"); <u>see generally</u> <u>Notice of Determinations Regarding</u>

<u>Eligibility to Apply for Worker Adjustment Assistance</u>, 81 Fed. Reg. 9,509, 9,512 (Dep't

Labor Feb. 25, 2016); Unopposed Mot. Voluntary Remand, June 2, 2016, ECF No. 8

("Remand Mot.").  The court directed Labor to:

> consistent with applicable statutes and regulations: (1) conduct further
> investigation, as appropriate, including into the aggregate imports and
> domestic production data; (2) determine whether the petitioning workers, as
> engaged in activities related to the production of oil/gas, are eligible to apply
> for [TAA]; and (3) issue the appropriate redetermination on remand.

Remand Order 1.

Labor's Remand Results are not supported by substantial evidence.  Specifically,

the court remands Labor's determination that Plaintiffs are not entitled to certification for

TAA benefits as primary workers.  Labor's determination is not supported by substantial

evidence because: (1) Labor has not explained why its practice for comparing a firm's

sales data is reasonable; (2) Labor failed to consider whether like imports increased

absolutely, or explain why it was reasonable not to examine whether like imports had

---

[1] All further references to the Trade Act of 1974, as amended, are to Title 19 of the U.S. Code,
2012 edition.

increased; and (3) Labor failed to consider whether like imports had shifted to foreign countries, or explain why it was reasonable not to examine whether like imports had shifted to foreign countries.  In addition, the court remands Labor's determination not to certify Plaintiffs as secondary workers eligible for TAA benefits.  On remand, Labor must further explain its determination in light of these concerns or reconsider its determination consistent with this decision.

## BACKGROUND

Plaintiffs are a group of former employees of the survey department of Geokinetics, Inc. ("Geokinetics"), a company located in Houston, Texas that is engaged in "seismic oil [and] gas exploration," who became separated from the company as of January 31, 2015. See Public Administrative R. Item a at 1, Sept. 16, 2016, ECF No. 16-1 ("Pet."); Public Administrative R. Item o at 91, Sept. 16, 2016, ECF No. 16-1 ("Negative Determination Investigative Rep.").  Plaintiffs filed a petition seeking certification for TAA and ATAA benefits with Labor on July 10, 2015.  See Pet.  In their petition, Plaintiffs allege that their separations occurred as a result of "OPEC's decision to increase oil production, [which] caused widespread lay-offs and job cuts in the Energy Industry." Id. at 2.  Plaintiffs annex to their petition a copy of a letter from Geokinetics informing one of its employees, a mapper and surveyor, that his employment is terminated as of January 29, 2015.  Id. at 3.  Geokinetics' letter attributed this employee's loss of employment to "the current downturn in the energy industry and its effect on [the] company . . . not a reflection on [this employee's] performance."  Id.

After determining that Plaintiffs had correctly filed a petition, on September 23, 2015, Labor's Office of Trade Adjustment Assistance ("OTAA") began its investigation by soliciting information regarding Plaintiffs' worker group through a Business Data Request ("BDR") issued to Geokinetics, which included a Form ETA-9043a requesting data tailored to producers of an article.  See Public Administrative R. Item e at 16, Sept. 16, 2016, ECF No. 16-1; Public Administrative R. Item f at 18–28, Sept. 16, 2016, ECF No. 16-1.  On September 24, 2015, Geokinetics responded to Labor's request indicating that it "does not produce any articles" and referencing the form's directions that the company contact the investigator assigned to the case if the company does not produce an article.  See Public Administrative R. Item h at 42, Sept. 16, 2016, ECF No. 16-1.  Labor responded indicating that it would send a revised BDR for services "to be completed instead of the BDR for articles."  Id. at 41–42.  On October, 22, 2015, Labor sent a revised BDR for services ("First BDR").[2]  See Public Administrative R. Item I at 44–57, Sept. 16,

---

[2] This First BDR, which pertained to services, requested information necessary to evaluate Plaintiffs' eligibility for TAA and ATAA benefits, including: (1) a description of services supplied by the subject firm; (2) whether worker separations have occurred and the reasons for separation; (3) whether the firm imported or acquired services like or directly competitive with the services supplied by the subject firm from a foreign country; (4) whether the subject firm shifted like or directly competitive services to another country or if such a shift is scheduled; (5) whether the services supplied by the subject firm are supplied to another division, parent company, or affiliate that is producing an article; (6) whether the worker separations were caused in any part by the subject firm importing any articles like or directly competitive with articles produced using services supplied by the workers at the subject firm; (7) import data, production and sales data of the company for the years 2013 and 2014 as well as for the periods January through September of 2014 and January through September of 2015; (8) whether the subject firm supplies services to a firm whose workers have been certified under the TAA program; and (9) a listing of the company's lost bids for contracts to supply services in the past 2 years.  First BDR at 46–53.

(footnote continued)

2016, ECF No. 16-1 ("First BDR").   Geokinetics responded to Labor's First BDR by

providing the requested information.  See Conf. Administrative R. Item j at 64, 67–68,

Sept. 16, 2016, ECF No. 15-1 ("First BDR Resp.").   However, in response to Labor's

question asking whether Geokinetics supplies services to a firm whose workers have

been certified under the TAA program, Geokinetics did not fill in a response in either the

box marked "yes" or the box marked "no."  See id. at 65.   Geokinetics attributed the

separation of the worker group to a decline in the oil and gas sector to which it provides

services, which it contends is caused by "a sustained collapse in the price of oil.  As oil

prices have decreased, so has exploration activity, which has greatly reduced the need

for our highly specialized services."  Id. at 63.

On January 16, 2016, Labor issued its first negative determination on Plaintiffs'

petition for certification as a worker group eligible for TAA and ATAA benefits.[3]  See

Negative Determination at 98.   Labor denied Plaintiffs' petition for the following reasons:

(1) imports of services like or directly competitive with the services supplied by

Geokinetics have not increased;[4] (2) Geokinetics did not shift the supply of seismic data

---

Aside from the fact that the First BDR pertaining to services requested information on services provided rather than on articles produced, the First BDR differed from the BDR issued by Labor on September 23, 2015 in that the First BDR requested import data, production and sales data of the company for the periods January through September of 2014 and January through September of 2015.  See Public Administrative R. Item f at 23, Sept. 16, 2016, ECF No. 16-1.

[3] Labor defines the subject worker group as the survey department of Geokinetics.  See Negative Determination Investigative Rep. at 91 (citing Pet. at 1).

[4] No findings support Labor's determination.  See Negative Determination Investigative Report. Labor's investigative report contains no data reflecting the level of U.S. imports of articles or services like or directly competitive with articles produced or services supplied by Geokinetics. See id.

acquisition or like or directly competitive services to a foreign country or acquire such

services from a foreign country;[5] (3) Geokinetics is not a supplier of services to a firm that

employs workers that have been certified as eligible for TAA or ATAA benefits; and (4)

Geokinetics does not act as a downstream producer to a firm that employed a group of

workers who had been certified as eligible for TAA or ATAA benefits.[6]  See Negative

Determination at 97–98.

On June 2, 2016, Defendant moved for remand so that Labor could "conduct

further investigation and redetermine whether certain current and former employees of

Geokinetics are eligible for certification for [TAA] benefits."  Remand Mot. 1.  Plaintiffs did

not oppose Defendant's remand request.  Id.  In its request for remand, Defendant states

that, although "Labor addressed whether there was evidence of an increase in 'imports

of services like or directly competitive with the services supplied by Geokinetics,' . . .

Labor did not address whether there has been an increase in relevant imports of articles."[7]

---

[5] To support this determination, Labor referenced Geokinetics' response to its First BDR. Negative Determination Investigative Rep. at 91 (citing First BDR Resp. at 63).

[6] Labor does not cite support for its determinations that: (1) Geokinetics is not a supplier of services to a firm that employs workers that have been certified as eligible for TAA or ATAA benefits; or (2) that Geokinetics does not act as a downstream producer to a firm that employed a group of workers who had been certified as eligible for TAA or ATAA benefits.  See Negative Determination Investigative Rep. at 92; Negative Determination at 97–98.

[7] Although Defendant states that Labor addressed whether there was evidence of an increase in imports of services provided by Geokinetics, see Remand Mot. 2–3, Labor's investigative report contains no U.S. import data for any like or directly competitive service.  See Negative Determination Investigative Rep. at 91–92.  Labor only references Geokinetics response to Labor's inquiry data relating to Geokinetics' own imports of like or directly competitive services with those it supplies.  See id. at 92 (citing First BDR Resp. at 63 (answering that Geokinetics itself has not imported or acquired from a foreign country services like or directly competitive with

(footnote continued)

Id. at 2–3.  Defendant further recognized that Plaintiffs' claim raises a question as to whether Plaintiffs may be eligible for TAA benefits "as employees of a firm that produces articles directly competitive with imports of oil and gas."[8]  Id. at 3.  Lastly, Defendant contended that, in order to make such a determination during remand, "Labor will conduct further investigation, as appropriate, including into the aggregate imports and domestic production data" of oil and gas.  Id.  On June 3, 2016, the court granted Defendant's motion for remand.  See Remand Order.

During its investigation on remand, Labor issued a second BDR ("Second BDR") to Geokinetics, which included a Form ETA 9043a for firms that produce articles.  See Administrative R. Item t at 124–132, Sept. 16, 2016, ECF No. 16-1 ("Second BDR Resp.").  Together with its Second BDR, Labor included a covering e-mail, which advised that

> According to [19 U.S.C. § 2272(c)(2)] any firm that engages in exploration or drilling for oil or natural gas shall be considered to be a firm producing oil or natural gas and any firm that engages in exploration or drilling for oil or natural gas, or otherwise produces oil or natural gas, shall be considered to be producing articles directly competitive with imports of oil and with imports of natural gas.  Additionally, the Conference Report that accompanied H.R. 3 (Omnibus Trade and Competitiveness Act of 1988), which amended the Trade Act, explains the expansion of eligibility to all workers and firms in the oil and natural gas industry (exploration to refining) and to workers and firms

---

the services it supplies, but not providing U.S. import data on services like or directly competitive with those provided by Geokinetics)).  Labor does not explain why Geokinetics response to this question is relevant to assessing whether there has been an increase in imports of services into the United States like or directly competitive with those provided by Geokinetics.  See id..

[8] Defendant argued that

> [a] remand is appropriate to permit Labor to conduct further investigation, including into whether there has been an increase in the importation of oil and natural gas, and any other information appropriate to the determination regarding a firm producing articles like or directly competitive with imports of oil and imports of natural gas.

Remand Mot. 3.

who supply essential goods or essential services as their principal trade or
business to firms in the oil or natural gas industry.  This expanded list would
include, for example, independent drillers, pumpers, seismic and
geophysical crews, geological crews, and mud companies.

When answering form ETA-9043a – Business Data Request (Article),
please be advised that your responses should be based upon the activities
of the firm, as well as the firm's production of oil and natural gas (if
applicable).

Id. at 122.

Labor's Second BDR requested new employment, sales, and import data of the

company for the years 2013 and 2014 as well as for the periods January through June of

2014 and January through June of 2015.[9]  See id. at 132.  Labor's Second BDR otherwise

differed from the first, in relevant part, in that it requested: (1) a description of articles

manufactured by the subject firm, their end uses, and whether the articles are

incorporated as components into another article; (2) information on whether the subject

firm imported or acquired from a foreign country articles like or directly competitive with

the articles it produces; (3) information on whether the subject firm imported articles that

incorporate an article like or directly competitive with the articles it produces; (4)

information on whether the subject firm shifted production of articles like or directly

---

[9] In Labor's First BDR, Labor requested employment, sales, production, and import data for the
years 2013 and 2014 as well as for the periods January through September of 2015.  See First
BDR at 34.  The periods in Labor's Second BDR pertaining to articles were the years 2013, 2014,
January through June 2014, and January through June 2015.  Second BDR Resp. at 127.  The
periods for which Labor requested data in the Second BDR matched the periods in the initial BDR
pertaining to articles that Labor issued in its initial investigation on September 23, 2015.  Compare
Public Administrative R. Item f at 23, Sept. 16, 2016, ECF No. 16-1 (requesting employment,
sales, production and import data for the periods 2013, 2014, January through June 2014, and
January through June 2014) with Second BDR Resp. at 127 (also requesting employment, sales,
production and import data for the periods 2013, 2014, January through June 2014, and January
through June 2014).

competitive with articles it produces to another country or whether such a shift in

production is scheduled; (5) information on whether the firm experienced a decline in

sales to a customer located outside the United States; and (6) information on whether the

subject firm conducts business with any firm whose workers have been certified under

the TAA program.  See id.

>  Geokinetics responded to the Second BDR by stating that

>  many answers are the same as in the previous submission but for many others the answer is not N/A as we are not a company that manufactures products but rather provides services.   Therefore, we do not have "production numbers," for example.

Id. at 120.  Geokinetics otherwise provided the information requested in Labor's Second

BDR.[10]  See Second BDR Resp. at 124–132.  In response to Labor's question asking

whether it conducts business with a firm whose workers have been certified under the

TAA program, Geokinetics did not mark either the box marked "yes" or the box marked

"no."  See id. at 128.

On September 16, 2016, Labor filed its remand results affirming its original

negative determination not to certify Plaintiffs as a class of workers entitled to TAA

---

[10] Geokinetics reported identical employment data in its Second BDR response, but the sales data reported and the periods differed.  See Conf. Administrative R. Item t at 132, Sept. 16, 2016, ECF No. 15-1; First BDR Resp. at 64.  In its First BDR response, Geokinetics reported sales of "seismic acquisition" services $[[                ]] for the period January through September of 2014 and $[[              ]] for the period January through September of 2015.  See First BDR Resp. at 64.  In its Second BDR, Labor requested that Geokinetics report sales of "seismic acquisition," which Labor denoted as an "article produced."  Second BDR Resp. at 127.  In its Second BDR response, Geokinetics reported sales for the period January through June of 2014 of $[[            ]].  Second BDR Resp. at 132.  For the period January through June of 2015, Geokinetics reported sales of $[[               ]].  Id.  In each field where Labor requested that Geokinetics report the quantity of "seismic acquisition" articles produced during a given period, Geokinetics wrote in "Services."  Id.

benefits.  See Remand Results 8.  Labor continued to find that Geokinetics is "engaged

in activities related to the supply of seismic data services to firms within the oil industry."

Id. at 1 (citing Pet. at 1–5; Negative Determination Investigative Report at 90–91).  Labor

identified seismic data services provided by Geokinetics as "production of oil under 19

U.S.C. § 2272(c)(2)."  Id.  Labor determined that: (1) a significant number or proportion of

workers at the subject firm is totally or partially separated, or threatened with such

separation; (2) industry data shows that aggregate imports of oil and gas during the

relevant period decreased; (3) Geokinetics' sales/production increased during the

relevant period; (4) Geokinetics did not shift the production of articles like or directly

competitive with oil to a foreign country; (5) Geokinetics is not a supplier to a firm that

employs workers that have been certified as eligible for TAA or ATAA benefits; and (6)

Geokinetics does not act as a downstream producer to a firm that employed a group of

workers who had been certified as eligible for TAA or ATAA benefits.  Id. at 6–7 (citing

Negative Determination Investigative Report at 90–92).

In its Remand Results, Labor revisited certain aspects of its initial determination

after further developing the record.  First, Labor reviewed the information collected in its

initial investigation along with revised sales and production data provided by Geokinetics

for the years 2013 and 2014 and the periods January through June of 2014 and January

through June of 2015.[11]  See Remand Results at 4 (citing Second BDR Resp. at 132).

---

[11]In completing the Second BDR, Geokinetics filled in "services" in the field where it was directed
to fill in quantity of sales.  See Second BDR Resp. at 132.  Labor determined that Geokinetics is
engaged in the production of oil.  Remand Results at 4. Therefore, Labor concluded that
Geokinetics' sales data functions as production data.  Id.

Labor determined that the revised data comparing sales/production data for the years 2013, 2014 as well as the periods January through June of 2014 and January through June of 2015 show an overall increase in sales and production.[12]  See id. at 6.  Second, Labor compared aggregate import data of oil and gas into the United States for the periods from August of 2013 through June of 2014 and August of 2014 through June of 2015, and Labor concluded that aggregate imports of oil and gas decreased.[13]  Id. at 6

---

[12] In the investigative report prepared in connection with its remand, Labor requested that Geokinetics complete the ETA-9043a form for firms engaged in the production of an article (i.e., oil and gas), and Geokinetics reported sales data.  See Conf. Administrative R. Item Y at 157–158, Sept. 16, 2016, ECF No. 15-1.  In its remand investigative report, Labor found that Geokinetics' sales, which Labor treats as equivalent to production data, decreased in 2014 from 2013 levels by $[[          ]], and sales increased from January to June 2014 to the period from January to June 2015 by $[[          ]].  Id. at 158.  In the remand investigative report, Labor further stated that its initial investigation did not include production figures because "the general counsel representing Geokinetics, Inc. responded that the firm is engaged in activities related to the supply of a service."  Id. at 154.

[13] Labor states that it considers Geokinetics "to be engaged in the production of oil rather than the provision of a service" because of the language in 19 U.S.C. § 2272(c)(2).  Administrative R. Item y at 157–158, Sept. 16, 2016, ECF No. 15-1.

On remand, Labor examined oil and gas imports.  Administrative R. Item y, Sept. 16, 2016, ECF No. 15-1.  Labor found that U.S. imports of crude oil declined from 2,821,480 thousand barrels in 2013 to 2,680,626 thousand barrels in 2014 (a 4.99% decline), and have declined further from 1,322,027 thousand barrels in the period from January through June of 2014 to 1,315,438 thousand barrels in the period from January through June of 2015 (a 0.50% decline).  Id. at 154, 158–59.  Labor also found that U.S. production of crude oil has increased from 2,720,782 thousand barrels in 2013 to 3,180,363 thousand barrels in 2014 (a 16.89% increase) with a further increase from 1,514,407 thousand barrels in the period from January through June of 2014 to 1,701,470 thousand barrels in the period from January through June of 2015 (a 12.35% increase).  Id. at 159.

Labor found that U.S. imports of natural gas declined from 2,883,355 million cubic feet in 2013 to 2,695,355 million cubic feet in 2014 (a 6.52% decline), but increased from 1,383,948 million cubic feet in the period from January through June of 2014 to 1,406,002 million cubic feet in the period from January through June 2015 (a 1.59% increase).  Id.  Labor also found that U.S. production of natural gas increased from 24,205,523 million cubic feet in 2013 to 25,728,496 million cubic feet in 2014 (a 6.29%) increase, and continues to increase from 11,878,793 million cubic feet in the period from January through June of 2014 to 13,402,995 million cubic feet in the period from January through June of 2015 (a 12.83% increase).  Id. at 159–60.

(citing Public Administrative R. Item v at 136–146, Sept. 16, 2016, ECF No. 16-1; Public

Administrative R. Item w at 147–150, Sept. 16, 2016, ECF No. 16-1).  Labor otherwise

found that the record information obtained on remand confirmed its other findings in the

negative determination.  See Remand Results at 6–7.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(d)(1) (2012) and 19 U.S.C.

§ 2395(a).  Under 19 U.S.C. § 2395(b) the agency's determination must be sustained if it

is supported by substantial evidence in the administrative record and is otherwise in

accordance with law.  See 19 U.S.C § 2395(b) (providing that the Court may remand

Labor's findings of fact to take further evidence for good cause); see also 28 U.S.C.

§ 2640(c) (2012) (making an action to review a determination by Labor reviewable under

the standard provided by 19 U.S.C. § 2395(b)).

## DISCUSSION

### I.   Certification of Primary Workers

The court reviews Labor's analysis of Plaintiffs' eligibility for certification as primary

workers.  First, the court reviews Labor's determination that Geokinetics' sales increased.

For the reasons that follow, Labor's determination is not supported by substantial

evidence.  Second, the court reviews Labor's determination that imports of like or directly

competitive articles have increased.   This determination is also not supported by

substantial evidence.  Third, the court reviews Labor's determination that Geokinetics has

not shifted production of like or directly competitive articles to a foreign country or acquired

like or directly competitive articles from a foreign country.  For the reasons that follow, the

court also concludes that this determination is not supported by substantial evidence.

### A. Decreased Sales

Plaintiffs contend that Labor compared incorrect periods of sales data to support

its determination that Geokinetics' sales increased during the relevant period.  Comments

of Pls. Former Employees of Geokinetics, Inc. on Remand Results Confidential Version

5–7, Nov. 16, 2016, ECF No. 17 ("Pls.' Remand Comments").  Specifically, Plaintiffs

argue that Labor failed to consider sales data for the month of July in both 2014 and 2015,

which it argues is part of the relevant time period for comparison under the statute.  Id. at

6.   Plaintiffs claim that Labor's conclusion likely would have been different if it had

considered the additional months of sales data.[14]  Id.  Defendant responds that Labor's

determination is supported by the record because Geokinetics' sales declined during the

relevant time periods, as interpreted by Labor based on relevant statutory and regulatory

authorities.  See Def.'s Resp. Pl.s' Comments Dep't Labor's Remand Results 11, n.2,

Dec. 30, 2016, ECF No. 21 ("Def.'s Reply").  The court remands Labor's determination

that Geokinetics' sales decreased absolutely for further explanation and consideration

consistent with this decision.

---

[14] Plaintiffs argue that the sales data produced by Geokinetics showed a "[[

        ]]"  Pls.' Remand Comments 6.  Therefore, Plaintiffs claim that "[i]ncluding July data
for 2014 and 2015 very easily could flip the interim data for 2014 to 2015 to a decline in sales
value."  Id.  Regardless of whether the data makes a difference, Plaintiffs argue that Labor's
determination cannot be supported by substantial evidence if it fails to consider the appropriate
time periods.  See id.

Certain workers who have been affected by an increase in foreign imports or a shift in production or services to a foreign country are eligible for certification by Labor for TAA benefits.  19 U.S.C. § 2272(a).  To be eligible for certification under § 2272(a), "a significant number or proportion of the workers in such workers' firm" must have become separated.  19 U.S.C. § 2272(a)(1).  If this threshold requirement is satisfied, there are two general paths leading to certification under § 2272(a): (1) the increased imports path, 19 U.S.C. § 2272(a)(2)(A); and (2) the shift in production or services path, 19 U.S.C. § 2272(a)(2)(B).  To qualify for certification under the increased imports path, the workers' firm's sales or production, or both, must also have decreased absolutely.  19 U.S.C. § 2272(a)(2)(A)(i).  In addition, any such increase must have "contributed importantly to such workers' separation or threat of separation and to the decline in sales or production of such firm."  19 U.S.C. § 2272(a)(2)(A)(iii).

The statute does not define the time periods for Labor to analyze in assessing whether the subject firms sales have decreased absolutely under the increased imports path.  See 19 U.S.C. § 2272(a)(2)(A)(i)  Defendant states that Labor's practice for determining the relevant time periods for comparing sales data is contained in Labor's BDR, which is sent to subject firms during the TAA investigation.  See Def.'s Reply 11, n.2.  Labor's First BDR requests that the subject firm report employment, sales, production, and import data for "the service identified for the last two full years, the most recent year-to-date period, and the comparable period in the previous year."  See First BDR at 49.  Labor's Second BDR form, issued in the remand investigation, asks the firm to report its employment, sales, and production data "for the periods provided in the table."

From the face of the Second BDR form pertaining to articles, it does not appear that Labor

has any uniform practice for determining the periods for which to examine decreases in

sales and production of subject firms because the language of the form does not state a

uniform methodology for computing the time periods.  Moreover, a comparison of Labor's

First BDR to its Second BDR reveals that Labor defined the relevant periods of time

differently in each depending upon whether the form pertained to articles or services.

Compare First BDR at 34 (requesting partial year data from January through September

of 2014 and January through September of 2015) to Second BDR at 127 (requesting

partial year data from January through June of 2014 and January through June of 2015).

Labor never explains this discrepancy.

Here, Labor determined that a significant number or proportion of workers at the

subject firm is totally or partially separated.[15]   Remand Results 6 (citing Conf.

Administrative R. Item y at 154, Sept. 16, 2016, ECF No. 16-1("Remand Investigative

Rep.")).  Defendant contends that "Labor requested comprehensive sales data for the

most recent completed quarters prior to the petition (in this instance, the first two quarters

of 2015), and the comparable period in the previous year."   Def.'s Reply 11 (citing

Remand Results 6).  Defendant justifies obtaining sales and production data for the most

recent period as

---

[15] Labor reviews its findings in its investigative report supporting its initial negative determination, in which Labor notes that it determined that Geokinetics had separated approximately [[     ]] workers since July 31, 2014.  Remand Investigative Report at 154.  Labor further reviews the fact that the investigation found that [[   ]] more workers were to be separated in the fourth quarter of 2015 and the first quarter of 2016.  Id.  Lastly, Labor notes that the investigation found that Geokinetics stated that "there were a total of [[     ]] workers in the worker group through September 2015."  Id. (citing First BDR Resp.).

> ensur[ing] that the periods of review of imports either predate or occur simultaneously with the periods for review of sales or production, allowing Labor to analyze the relationship between import and sales or production data for evidence that the causal "contributed importantly" standard has been met.

Id. However, Labor fails to provide any indication that it has a defined practice to compare sales data for purposes of determining whether sales decreased to determine eligibility for TAA benefits.  Moreover, in this investigation Labor solicited information covering different periods in its initial investigation and on remand without explantion for or acknowledgment of the difference.  Compare First BDR at 34 (requesting partial year data from January through September of 2014 and January through September of 2015) to Second BDR at 127 (requesting partial year data from January through June of 2014 and January through June of 2015).  Labor may have a reason for defining its relevant time periods to exclude the months of July of 2014 and 2015, but Labor has not explained how it defines these periods for purposes of assessing whether sales of the subject firm have decreased, nor has it explained why the periods compared here are reasonable.  See Remand Results 6.  On remand, Labor must explain how it determines the relevant periods for comparing sales data and explain why its practice is reasonable in light of its statutory mandate to determine whether the sales or production, or both, of the subject firm have decreased, or reconsider its determination.

Defendant contends that Labor's practice for determining the periods for comparison of sales and production data is reasonable because it ensures that such data either occurs simultaneously or after the periods of review of imports.  Def.'s Reply 11.  Defendant further argues that looking at import data that either predates or occurs

simultaneously with the periods of review for sales and production data ensures a causal

relationship between the increased imports and the decrease in sales or production

required by the statute.  See id. (referencing 19 U.S.C. § 2272(a)(2)(A)(ii); 29 C.F.R.

§ 90.16(b)(3) (2015)[16]).  Defendant's explanation addresses why it is reasonable to look

at sales and production data for a period occurring simultaneously or after the period of

review for the increase in imports, but Labor does not explain why it is reasonable to

define that period as from January through June.  The effect of looking at sales data

through June of 2014 and 2015 is to exclude monthly data from July of 2014 and 2015

despite the fact that the petition was filed on July 10, 2015. Neither the statute nor Labor's

regulations defines the relevant periods for purposes of the decreased sales or production

comparison.  See 19 U.S.C. § 2272(a)(2)(A)(ii); 29 C.F.R. § 90.16(b)(3).  Although Labor

has discretion to fill gaps in the statute through practice, that practice must be a

reasonable means of effectuating the statutory purpose.  See Ceramica Regiomontana,

S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), aff'd 810 F.2d

1137, 1139 (Fed. Cir. 1987).  Without further explanation, the court cannot assess the

reasonableness of Labor's practice for defining these time periods or assess whether the

discrepancy between how it defines these periods based on whether it is assessing

producers of articles or providers of services is arbitrary.  Firms in industries like oil and

gas, where contracts are bid for far in advance, may be unlikely to show a decrease in

sales well before laying off workers.  Because firms in long-lead industries must make

staffing decisions based on forecasted demand, anticipated decreases in sales may only

---

[16] Further references to the Code of Federal Regulations are to the 2015 edition.

become apparent immediately prior to the workers' separation in such firms because the firm anticipates decreased sales in the future.   Thus, data for the month immediately preceding the filing of the petition may be particularly relevant in evaluating eligibility in this investigation.   On remand, Labor must explain why its interpretation is reasonable in light of these concerns.

Defendant also contends that Plaintiffs' "speculation that including July 2015 sales data would have changed Labor's determination is contradicted by record evidence." Def.'s Reply 12 (citing First BDR Resp. at 64 (showing that sales for the first three quarters of 2015 were greater than the same period of 2014) (internal citation omitted)).   However, quarterly sales data reflecting increases in third quarter sales does not necessarily demonstrate that the results would not have been different had Labor included only July sales.

### B.  Increased Imports

Plaintiffs argue that Labor failed to consider whether imports of seismic data services have increased.   Pls.' Remand Comments 8–9.   Defendant responds that Labor properly limited its examination to imports of articles of oil and gas because the statute requires Labor to limit its analysis to oil and gas imports.[17]   Def.'s Reply 8–9 (citing 19

---

[17] Although neither party requested oral argument, after reviewing the parties' submissions, the court asked Defendant for further explanation on why its interpretation of 19 U.S.C. § 2272(a)(2)(A)(ii)(I) as precluding Labor from considering whether imports of services like or directly competitive with those produced by Geokinetics had increased during the relevant period is reasonable.   See Conf. Letter Concerning Suppl. Briefing Questions 1–3, Jan. 23, 2017, ECF No. 22; see also Order, Jan. 23, 2017, ECF No. 23; Def.'s Reply Br. 8–11.   Labor did not state its

(footnote continued)

U.S.C. § 2272(c)(2)(A)–(B)).   The court remands Labor's determination for further

consideration and explanation.   Section 2272(c)(2)(B) instructs Labor to treat oil and

natural gas exploration and drilling services as articles directly competitive with imports

of oil and natural gas.   19 U.S.C. § 2272(c)(2)(B).   However, § 2272(a)(2)(A)(ii) requires

Labor to consider increased imports of not only directly competitive articles, but also

increased imports of like articles.   See 19 U.S.C. § 2272(a)(2)(A)(ii).   On remand, Labor

must explain why it is reasonable to consider only oil and gas imports, which the statute

instructs are directly competitive with oil and natural gas exploration and drilling services,

and therefore not like imports, in evaluating Plaintiffs' eligibility for TAA certification.

In order to qualify for certification under the increased imports path, in addition to

determining whether a significant number or proportion of workers in the subject firm have

become totally or partially separated, see 19 U.S.C. § 2272(a)(1), three additional criteria

must be present.   First, "the sales or production, or both, of [the workers'] firm [must] have

decreased absolutely."   19 U.S.C. § 2272(a)(2)(A)(i).   Second, "imports of articles or

services like or directly competitive with articles produced or services supplied by [the

---

interpretation of the statute in its Remand Results.  See Remand Results 6.  Defendant first stated
that Labor's determination not to consider increases in services resulted from Labor's
interpretation of the statute in its reply brief.  See Def.'s Reply Br. 8–11.  In response to the court's
questions, Defendant states that 19 U.S.C. § 2272(a)(2)(A)(i) requires it to consider oil and natural
gas exploration and drilling services firm as engaging in the production competitive with oil and
natural gas.  Def.'s Suppl. Br. 4, Feb. 13, 2017, ECF No. 29.  Defendant's argument is first raised
in Defendant's supplemental brief, see id., to which the court did not permit Plaintiffs to respond.
See Order, Jan. 23, 2017, ECF No. 23.

subject] firm [must] have increased."[18]  19 U.S.C. § 2272(a)(2)(A)(ii)(I).  The increase can

be either absolute or relative to domestic production compared to a representative base

period.[19]  29 C.F.R. § 90.2.  If these first two criteria are met, Labor must also find that

any such increase "contributed importantly to such workers' separation or threat of

separation and to the decline in sales or production of such firm."   19 U.S.C.

§ 2272(a)(2)(A)(iii).

The statute requires Labor to consider whether imports that are like or directly

competitive with articles produced or services provided by the subject firm have

increased.  See 19 U.S.C. § 2272(a)(2)(A)(ii).  The statute provides that "[a]ny firm that

engages in exploration or drilling for oil or natural gas, or otherwise produces oil or natural

---

[18] Alternatively, though not at issue in this remand, a petitioning group could show that:

    (1) "imports of articles like or directly competitive with articles into which one or more component parts produced by [the subject] firm are directly incorporated . . . have increased," 19 U.S.C. § 2272(a)(2)(A)(ii)(II)(aa);

    (2) "imports of articles like or directly competitive with articles which are produced directly using services supplied by such firm . . . have increased," 19 U.S.C. § 2272(a)(2)(A)(ii)(II)(bb); or

    (3) "imports of articles directly incorporating one or more component parts produced outside the United States that are like or directly competitive with imports of articles incorporating one or more component parts produced by [the subject] firm have increased," 19 U.S.C. § 2272(a)(2)(A)(ii)(III).

[19] To assess whether imports have increased, Labor examines imports during the "representative base period," (i.e., the earlier period of import data for comparison) defined as "one year consisting of the four quarters immediately preceding the date which is twelve months prior to the date of petition."  See 29 C.F.R. § 90.2.  Labor compares imports during the representative base period to a comparison period to determine if imports of like or directly competitive articles or services have increased.  See id.  Based upon the language of Labor's regulation, it can be inferred that the comparison period (i.e., the latter period of import data for comparison) is one year consisting of the four quarters preceding the date of the petition.  See id.  Labor uses the term "relevant time period" throughout its Remand Results to refer to the later period for comparing imports.  See, e.g., Remand Results 4–6.

gas, shall be considered to be producing articles directly competitive with imports of oil

and with imports of natural gas."[20]   19 U.S.C. § 2272(c)(2)(B).   Therefore, as Labor

concluded in its remand determination, the provision of oil and natural gas exploration

and drilling services is, for the purposes of the statute, the production of articles directly

competitive with oil or natural gas.   See Def.'s Suppl. Br. 4 (citing 19 U.S.C.

§ 2272(c)(2)(A)–(B)).   But the statute mandates that Labor consider both increases in

---

[20] In 1988 Congress amended § 2272 to add 19 U.S.C. §§ 2272(c)(2)(A)–(B).  See Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1421, 102 Stat. 1107, 1242(1988).  The purpose of this amendment was to "facilitate the availability of benefits under the trade adjustment assistance program for workers employed by firms engaged in exploration or drilling for crude oil or natural gas."  H.R. Conf. Rep. 100-576, at 694 (Apr. 20, 1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1727.  Congress intended for "workers employed by independent firms engaged in exploration or drilling [to] be eligible to apply for program benefits on the same basis as workers employed by firms that are engaged in the production of crude oil or natural gas as well as exploration or drilling."  Id.  Previously, "workers engaged in exploration or drilling for firms that also produce crude oil or natural gas [were] considered as eligible to apply for such benefits."  Id.  See id.  At the time of the 1988 amendment, services were not covered under the TAA and workers in service industries did not qualify for TAA benefits.  In 2009, the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 1801, 123 Stat. 115, 367 (2009), amended 19 U.S.C. § 2272(a)(2)(A)(ii) to add imports of services like or directly competitive with services supplied by such firm to the increased imports path.  See H.R. Conf. Rep. 111-16, at 247 (Feb. 12, 2009), reprinted in 2009 U.S.C.C.A.N. 3, 654.  The motivation for making the change was that "[m]ost service sector workers presently are ineligible for TAA benefits because of a statutory requirement that the workers must have been employed by a firm that produces an 'article.'"  Id. at 249.  When Congress amended the statute in 2009 to extend the statute to all service workers, it did not deal with the fact that it had effectively previously deemed certain oil and gas service providers as producers of articles.  See American Recovery and Reinvestment Act § 1801.

imports of "like" and "directly competitive" articles.[21]  These words are not synonymous.[22]

The regulations reflect the different considerations each term in the statute calls upon

Labor to consider.[23]

In its original determination, Labor treated the Plaintiffs as workers in a firm

providing seismic data acquisition services.  See Negative Determination at 96–97.  Labor

---

[21] The statute separately states that "[a]ny firm that engages in exploration or drilling for oil or natural gas shall be considered to be a firm producing oil or natural gas."   19 U.S.C. § 2272(c)(2)(A).  This provision seems to relate to subsection (e) of the act, which allows workers to seek benefits if their "firm is publicly identified by name by the International Trade Commission as a member of a domestic industry in an investigation resulting in an affirmative determination" pursuant to 19 U.S.C. §§ 2252(b)(1), 2451(b)(1), 1671(b)(1)(A) or 1673(b)(1)(A).  See 19 U.S.C. § 2272(e).

[22] Indeed, the legislative history corroborates the notion that the words are not used interchangeably, specifically stating that:

> The term "like or directly competitive" used in the bill to describe the products of domestic producers that may be adversely affected by imports was used in the same context in section 7 of the 1951 Extension Act and in section 301 of the Trade Expansion Act.  The term was derived from the escape-clause provisions in trade agreements, such as article XIX of the GATT.  The words "like" and "directly competitive," as used previously and in this bill, are not to be regarded  as synonymous or explanatory of each other, but rather to distinguish between "like" articles and articles which, although not "like", are nevertheless "directly competitive."   In such context, "like" articles are those which are substantially identical in inherent or intrinsic characteristics (i.e., materials from which made, appearance, quality, texture, etc.), and "directly competitive" articles are those which, although not substantially identical in their inherent or intrinsic characteristics, are substantially equivalent for commercial purposes, that is, are adapted to the same uses and are essentially interchangeable therefor.

145 Cong. Rec. H10937 (daily ed. Dec. 10, 1973) (statement of Rep. Ullman; summary of Section 201 of the Trade Act of 1974).  See also S. Rep. No. 93-1298, at 232 (1974), reprinted in 1974 U.S.C.C.A.N. 7185, 7360.

[23] The regulations provide that "like or directly competitive means that like articles are those which are substantially identical in inherent or intrinsic characteristics (i.e., materials from which the articles are made, appearance, quality, texture, etc.); and directly competitive articles are those which, although not substantially identical in their inherent or intrinsic characteristics, are substantially equivalent for commercial purposes (i.e., adapted to the same uses and essentially interchangeable therefore)."  29 C.F.R. § 90.2.

sought a remand to consider Plaintiffs' eligibility for TAA benefits as workers of a firm

producing an article despite the fact that Geokinetics provides seismic data services

because that is what the statute requires.  Remand Mot. 2–3; Def.'s Suppl. Br. 4.[24]  Fair

enough.  However, Labor's determination restricts itself to considering imports of directly

competitive products as defined by § 2272(c)(2)(B), i.e., oil and natural gas articles.  See

Remand Results at 6–7.  Labor's analysis ignores the language of the statute requiring it

to also consider imports of like articles and the statute's broader remedial purpose.[25]  If

---

[24] In its determination on remand, Labor did not tie its determination to consider increased imports of oil and gas to an interpretation of the statute requiring it to consider Geokinetics to be only a producer of an article.  See Remand Results 2–4, 6–7.  In its request for remand, Defendant states that, whereas "Labor addressed whether there was evidence of an increase in 'imports of services like or directly competitive with the services supplied by Geokinetics,' . . . Labor did not address whether there has been an increase in relevant imports of articles."  Remand Mot. 2–3.  Nor do Labor's instructions to Geokinetics accompanying its Second BDR questionnaire alert Geokinetics to the notion that Geokinetics is only a provider of articles and not a provider of services.  See Second BDR Resp. at 122.  Labor's instructions state affirmatively that the statute considers "any firm that engages in exploration of drilling for oil or natural gas, or otherwise produces oil or natural gas" to be "producing articles directly competitive with imports of oil and with imports of natural gas."  Id.  Labor further instructs that Geokinetics responses "should be based upon the activities of the firm, as well as the firm's production of oil and natural gas (if applicable)."  Id.  It is unclear from these instructions that Geokinetics responded understanding that Labor considers it only a provider of articles and not provider of services.  In fact, the confusion of Geokinetics' general counsel is apparent from her correspondence with Labor.  Geokinetics states

> You will note that many answers are the same as in the previous submission but for many others the answers [are] now N/A as we are not a company that manufactures products but rather provides services.  Therefore we don't have "production numbers," for example.

Id. at 120.

[25] Since its inception, the statute has required Labor to consider the effect of increased imports in order to assess whether those imports are in some measure causing harm to domestic workers.  See Trade Expansion Act of 1962, Pub. L. No. 87-794, § 302, 76 Stat. 872, 885-886 (1962).  The Trade Expansion Act of 1962 established relief that was the precursor to TAA under the Trade Act of1974.  Section 301 of the Trade Expansion Act tied eligibility of a group of workers for tariff

(footnote continued)

the statute requires Labor to adopt the fiction that oil and gas exploration and drilling

service providers produce articles that are directly competitive with oil and gas production,

then Labor must explain why it is reasonable not to consider imports of seismic data

services (which would appear to be "like" the articles produced by those same service

providers) in order to foster the remedial purposes of the statute or reconsider its

determination.[26]

---

adjustment assistance to the United States Tariff Commission's (i.e., the precursor agency to the U.S. International Trade Commission) determinations. Trade Expansion Act § 301. After a petition was filed the Tariff Commission had to investigate

> whether, as a result in major part of concessions granted under trade agreements, an article like or directly competitive with an article produced by such workers' firm, or an appropriate subdivision thereof, is being imported into the United States in such increased quantities as to cause, or threaten to cause, unemployment or underemployment of a significant number or proportion of the workers of such firm or subdivision.

Trade Expansion Act § 301(c)(2). A group of workers was eligible to apply for adjustment assistance if Labor found that

> the increased imports (which the Tariff Commission has determined to result from concessions granted under trade agreements) have caused or threatened to cause unemployment or underemployment of a significant number or proportion of workers of such workers' firm or subdivision thereof.

Trade Expansion Act § 302(a)(2). Therefore, the Trade Expansion Act tied the harm caused by increased imports to concessions granted under trade agreements. See id. The Trade Act of 1974 made it easier to secure benefits by no longer requiring that the increase in imports be tied to concessions explicitly granted under trade agreements, see Staffs of S. Comm. on Finance and H. Comm. on Ways and Means, 93rd Cong., Trade Act of 1974, Summary of the Provisions of the Provisions of H.R. 10710 7 (Comm. Print 1974), but the Trade Act of 1974 retained the concept that "like or directly competitive" articles are being imported and that such imports are causing worker separations or the threat of separation remained in the statute after these changes. Trade Act of 1974, Pub. L. No. 93-618, § 222, 88 Stat. 1978, 2019 (1975).

[26] Competition from foreign suppliers of seismic data acquisition services may have had a more significant impact on Geokinetics' decision to lay off its surveying department than increases in imports of oil and gas. For example, because the oil and gas industry is a global industry dominated by many large multinational players, it is likely that employees of U.S. providers of

(footnote continued)

Defendant's reliance on the Court of Appeals for the Federal Circuit's holding in

Former Employees of Marathon Ashland v. Chao, 370 F.3d 1375 (2004) to support its

determination does not address the question of whether Labor must also consider an

increase in like imports.  See Def.'s Suppl. Br. 2 (citing Former Employees of Marathon

Ashland v. Chao, 370 F.3d 1375, 1383–84 (2004)).  Rather, the Marathon court held that

Labor's determination that the services performed by gaugers, whose services were

involved in performing quality control on crude oil purchased from independent oil

producers, were not involved in the oil production process was supported by substantial

evidence.  See id. at 1376, 1383.  The court noted that the statute does not require all

employees who perform tasks at the interface between oil production and transportation

to be considered involved in production or transportation services.  Id. at 1381 (construing

identical statutory language in what was then 19 U.S.C. § 2272(b)(2)(A)–(B) (2000)).

Here, Plaintiffs do not challenge whether the services provided by Geokinetics are

involved in the oil production process or even whether imports of oil and natural gas

decreased, but rather argue that Labor should have considered increased imports of like

articles (i.e. seismic data services).  See Pls.' Remand Comments 8–9.

### C.  Shift in Production to Foreign Countries or Acquisition of Products from a Foreign Country

Plaintiffs argue that Labor failed to adequately evaluate whether Geokinetics

shifted production or services to foreign countries or acquisition of like or directly

---

exploration and drilling services could be harmed by competition from imports of foreign
exploration and drilling services providers even during a period when the U.S. oil imports was
decreasing.  Labor must explain the reasonableness of its determination in light of this concern.

competitive articles produced or services performed from a foreign country, which it is

obligated to independently investigate under the statute.  Pls.' Remand Comments 10–

12 (citing 19 U.S.C. § 2272(a)(2)(B)(i)(I)–(II)).  Defendant responds that Labor reasonably

relied on the unrebutted information on the record provided by Geokinetics to conclude

that Geokinetics had not shifted production or services to a foreign country or acquired

like or directly competitive articles produced or services supplied from a foreign country.

Def.'s Reply 13–15.   The record lacks evidence to support a determination that

Geokenetics did not shift production or services to a foreign country, and it is unclear

whether Labor considered a shift by Geokinetics in seismic data services to foreign

countries.

In order to qualify for TAA certification under the shift in production or services path

or shift in acquisition path, Labor must initially determine that a significant number or

proportion of the workers' firm have become totally or partially separate or have been

threatened to become totally or partially separated.  See 19 U.S.C. § 2272(a)(1).  If that

initial requirement is met, the statute further requires that Labor consider both whether:

(1) there has been a shift in the production of articles or the supply of services like or

directly competitive with the articles produced or services supplied by the subject firm to

a foreign country, 19 U.S.C. § 2272(a)(2)(B)(i)(I); or (2) the subject firm has acquired

articles or services that are like or directly competitive with articles which it produces or

services it supplies from a foreign country, 19 U.S.C. § 2272(a)(2)(B)(i)(II).  In addition,

the statute requires that such a shift have contributed importantly to the workers'

separation or threat of separation.  19 U.S.C. § 2272(a)(2)(B)(ii).

The court's concerns with regard to the distinct requirements of the terms "like" and "directly competitive" under the increased imports path apply equally with regard to Sections 2272(a)(2)(B)(i)(I) and 2272(a)(2)(B)(i)(II).  Thus, Labor must explain why it is reasonable to consider only whether directly competitive production shifted to foreign countries, see 19 U.S.C. § 2272(a)(2)(B)(i)(I) and whether the subject firm acquired from a foreign country articles that are directly competitive with articles produced by such firm, and exclude consideration of like products.

Here, Labor supports its determination that there has not been a shift to a foreign country or acquisition from a foreign country by the subject firm of articles like or directly competitive by referencing the negative responses to Labor's Second BDR questionnaire indicating that Geokinetics had not imported or acquired from a foreign country articles that are like or directly competitive with the articles it produced.  Remand Results 6–7 (citing Second BDR Resp. 126).[27]  It is not at all clear that Geokenetics understood the full import of Labor's question given Labor's shift in its approach to consider Geokinetics a producer of an article rather than a provider of services.[28]  Labor did not explain that,

---

[27] Geokinetics answers negatively Labor's questions about whether the subject firm "imported or acquired from a foreign country articles that are like or directly competitive with articles produced by the subject firm," and whether the subject firm "producing like or directly competitive articles shifted that work to another country or countries, or is a shift in production to another country scheduled."  Second BDR Resp. at 126.  Geokinetics answers "N/A" in the fields where Labor requested that it list "Production Shifted by the Subject Firm or Parent Company From this Location to Foreign Countries." Id. 132.

[28] As already discussed, it is apparent from the correspondence between Labor and Geokinetics in connection with completing Labor's Second BDR questionnaire that Geokinetics was confused about the implications of Labor's shift in approach.  See Second BDR at 120.  Geokinetics continued to view itself as a provider of services not a manufacturer of oil and natural gas products, see id.,  so it is unclear that Geokinetics considered the full range of articles that are like or directly competitive with oil and natural gas articles.

pursuant to statute, it would not consider seismic services to be like products.  As already

discussed, exploration and drilling services are, by statute, directly competitive with oil

and gas production.  See Def.'s Suppl. Br. 2–4; 19 U.S.C. § 2272(c)(2)(B).  Labor did not

consider whether seismic data services (presumably a like product to the articles

produced by Geokinetics) had been shifted to or been acquired from a foreign country.

See Remand Results 7.  Nor did it explain why it was reasonable not to make such an

inquiry.  Therefore, Labor's determination that Geokinetics did not shift the production of

articles like or directly competitive with oil and natural gas or acquire like or directly

competitive articles from a foreign country is not supported by substantial evidence.

Defendant's argument that Labor's determination is supported by Geokinetics'

response to Labor's First BDR questionnaire inquiring whether Geokinetics shifted to a

foreign country or acquired from a foreign country services or products that were like or

directly competitive with the services and products provided by Geokinetics is not

persuasive.  Def.'s Reply Br. 13. (citing First BDR Resp. at 63 (answering negatively to

Labor's questions about whether the subject firm "imported or acquired from a foreign

country services like or directly competitive with services supplied by the subject firm" and

whether the subject firm "supplying like or directly competitive services shifted that work

to another country or countries, or is a shift of services to another country scheduled")).

Labor's remand determination cites only to the Second BDR Response.  See Remand

Results 6-7.   On remand, Labor must clarify its approach to evaluating whether

Geokinetics shifted services to a foreign country, explain why it is reasonable to consider

only directly competitive articles, explain what record evidence supports its conclusion, or reconsider its determination.

## II. Certification of Adversely Affected Secondary Workers

Plaintiffs contend that Labor's conclusion that Geokinetics is not a supplier or downstream producer to a firm that employed a group of workers who received TAA certification is unsupported by substantial evidence.  Pls.' Remand Comments 13–14.  Defendant responds that Labor reasonably relied upon Geokinetics response in its BDR.  Def.'s Reply 15–17.  The statement relied upon by Labor to conclude that Geokinetics has no supplier or downstream producer relationship with a firm whose workers have been previously certified as primary workers entitled to TAA benefits does not support Labor's determination.  See Second BDR Resp. at 128.  On remand, Labor must explain what other evidence on the record supports its determination, inquire further to develop record information to support its determination, or reconsider its determination.

Similar to certification of primary workers, to be certified to receive TAA benefits as adversely affected secondary workers, the statute initially requires that "a significant number or proportion of the workers in the workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated."  19 U.S.C. § 2272(b)(1).  In addition, to be certified as secondary workers, the subject firm must be "a supplier or downstream producer to a firm that employed a group of workers who received [primary worker TAA certification], and such

supply or production must be related to the article or service that was the basis for such certification."  19 U.S.C. § 2272(b)(2).[29]

Here, Labor's determination that Geokinetics is not a supplier or downstream producer to a firm whose workers received primary worker TAA certification is unreasonable because it is based upon Geokinetics' incomplete responses to Labor's Second BDR questionnaire.  See Remand Results 7 (citing Second BDR Resp. at 128). Geokinetics left Labor's question asking whether it conducts business with a firm whose workers have been certified under the TAA program blank.  See Second BDR Resp. at 128.  Where Labor asked Geokinetics to provide a list of its customers that account for the majority of the decline of sales of "data acquisition" articles, Geokinetics responded: "[Not applicable ("N/A")] – Customers are variable depending upon exploration activities. Not constant/fixed."  Id.  It is unclear from this response that Geokinetics even understood the thrust of Labor's question.  Whether Geokinetics' customers vary depending upon exploration activities does not establish whether Geokinetics is a supplier or downstream producer to a firm whose workers received TAA certification as primary workers. Moreover, Geokinetics' blanket response of "N/A" to Labor's request that it provide a list of customers that account for the majority of the decline of sales does not make clear that the company is stating that a loss of business did not contribute importantly to Plaintiffs' separation.  Nor does Geokinetics' response that its customers vary necessarily establish

---

[29] Further, either: (1) the subject firm must be a supplier and the component parts it supplied to a firm it supplied must have accounted for at least 20 percent of the production or sales of the subject firm; or (2) a loss of business by the subject firm must have "contributed importantly to the workers' separation or threat of separation."  19 U.S.C. §§ 2272(b)(3)(A)–(B).

that the loss of supply or downstream customers did not contribute importantly to Plaintiffs' separation.  It is not reasonable for Labor to conclude based upon these limited and inconclusive responses that Plaintiffs had not satisfied the requirements for certification as secondary workers.  On remand, Labor must explain what record evidence supports a conclusion that Geokinetics is not a supplier or downstream producer to a firm whose workers were certified for TAA benefits as primary workers, what supports a determination that Geokinetics' loss of business did not contribute importantly to Plaintiffs' separation, or reconsider its determination.

It is also unclear what in the record supports Labor's statement in its findings that

> [s]eparations were not caused by a loss experienced by a customer whose workers were certified eligible to apply for Trade Adjustment Assistance (TAA), but rather by a steep drop in oil prices that was not caused by U.S. imports into the United States.

Remand Investigative Rep. at 160.  Although Labor's findings reference data showing a decrease in the price of oil, Labor references no data on the record suggesting a causal relationship between that drop in oil prices and the separations here.  On remand, Labor must explain what record evidence supports such a conclusion.

Defendant argues that Labor is entitled to accept the unrebutted statements responding to TAA inquiries without undertaking additional investigation.[30]  Def.'s Reply

---

[30] Defendant argues that Labor has no means to determine which firms do business with Geokinetics other than to rely upon its response to its request for a list of relevant customers. Def.'s Reply Br. 16.  The court's decision remanding Labor's determination does not prevent Labor's reliance on Geokinetics' customer list in all circumstances.  However, given the incompleteness of Geokinetics' response and the lack of clarity of the response Geokinetics' did give to address the relevant questions to evaluating Plaintiffs' eligibility for certification as secondary workers, it is unreasonable for Labor to rely on Geokinetics' response here.  See Second BDR Resp. at 128.

Br. 16 (citing <u>Marathon</u>, 370 F.3d at 1385; <u>Former Employees of Barry Callebaut v. Chao</u>, 357 F.3d 1377, 1382–83 (Fed. Cir. 2004)).  However, in order for Labor to reasonably rely upon such statements to support its determination, those statements must be creditworthy.  <u>See</u> <u>Marathon</u>, 370 F.3d at 1385; <u>Barry Callebaut</u>, 357 F.3d at 1382–83. Labor cannot deem a statement creditworthy unless it reasonably supports the facts Labor accepts those statements to establish.  Here, given the ambiguity in Geokinetics' responses, as already discussed, Labor cannot reasonably consider those responses to support the notion that Geokinetics is not a supplier or downstream producer to a firm whose workers were certified for TAA benefits as primary workers or that Geokinetics' loss of business did not contribute importantly to Plaintiffs' separation or reconsider its determination.

## CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that this action is remanded to Labor to clarify or reconsider, as appropriate, its remand redetermination on Plaintiffs' petition for certification for TAA benefits in accordance with this opinion; and it is further

**ORDERED** that Labor shall file its second remand redetermination with the court within 60 days of this date; and it is further

**ORDERED** that Plaintiffs shall have 30 days thereafter to file comments on the second remand redetermination; and it is further

**PUBLIC VERSION**

**ORDERED** that Labor shall have 15 days to file its reply to comments on the

second remand redetermination.


                                             /s/ Claire R. Kelly
                                            Claire R. Kelly, Judge

Dated: April 3, 2017
       New York, New York